Filed 10/29/14  Riggle v. Seaboard Envelope CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICHARD G. RIGGLE, | B253109 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC485027) |
| SEABOARD ENVELOPE CO., INC., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Mark V. Mooney, Judge.  Affirmed.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Scott R. Carpenter and Joshua J. Marx for Defendant and Appellant.

Burns & Moss and George S. Burns for Plaintiff and Respondent.

Defendant and appellant Seaboard Envelope Co., Inc. (Seaboard) appeals from an order for dissolution entered pursuant to Corporations Code section 1804[1] and from an order granting summary adjudication of a claim for involuntary dissolution under section 1800, subdivision (b)(5)[2] -- the sole remaining cause of action in this case brought by plaintiff and respondent Richard G. Riggle (Riggle).  We affirm the trial court's orders.

## BACKGROUND

**Factual background**

Seaboard is a closely held, family owned California corporation that manufactures and prints envelopes and that specializes in custom printing.  Its sole shareholders are Riggle, who owns 41.65 percent of the outstanding shares, and Riggle's half-brother Ronald Niedringhaus (Ronald),[3] who owns the remaining 58.35 percent of the shares.

Riggle began working at Seaboard in 1964, when he was 24 years old.  His sons, Phillip and Keith Riggle, daughter Veronica Riggle, and his grandson, Luis Figueroa, also worked at Seaboard until March 2012.

Riggle has served on Seaboard's board of directors since June 1980.  From 2004 until March 2, 2012, Ronald and Riggle were Seaboard's only directors.  Ronald also served as Seaboard's president, and Riggle held the title of chief financial officer.  Seaboard paid Ronald and Riggle each a salary of approximately $3,000 per week and provided health insurance for them and for their spouses.

---

[1]     All further statutory references are to the Corporations Code unless otherwise indicated.

[2]     Seaboard's notice of appeal states that it is an appeal from a judgment entered after an order granting summary judgment; however, there is no indication in the record that such a judgment was ever entered.  The appeal is nevertheless proper because the trial court's order granted summary adjudication of the sole remaining cause of action which effectively disposed of the case. (*Belio v. Panaroma Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101.)  We therefore treat the appeal from the order granting summary adjudication to be an appeal from a final judgment. (*Id*. at p. 1102.)

[3]     Because Ronald Niedringhaus and other officers and directors of Seaboard share the same surname, we refer to them by their first names so as to avoid confusion.

Ronald was diagnosed with multiple sclerosis in 2006 and his cognitive abilities declined. He began to delegate his responsibilities to others. In August 2011, he granted an irrevocable proxy to his daughter, Valerie Niedringhaus (Valerie), to vote his Seaboard shares.

Valerie, Riggle, and attorney Ryan Prager were present at a shareholders meeting and a directors meeting held on March 2, 2012. At the shareholder meeting, Valerie, Riggle, and Valerie's longtime boyfriend, Swarnendra Verma (Verma), were elected to Seaboard's board of directors.

At the directors meeting that immediately followed the shareholder meeting, Valerie was elected to serve as Seaboard's president and chief executive officer, chief financial officer, and secretary. Also at the directors' meeting, Prager informed Riggle that he was relieved of all of his duties at Seaboard, except those as a director. Prager did not explain why Riggle's employment at Seaboard was being terminated. Prager also informed Riggle that he could no longer enter Seaboard's premises without first receiving Valerie's permission to do so, and that even after receiving such permission, he must be accompanied by Valerie while on the premises.

After the March 2, 2012 directors' meeting, Valerie terminated the employment of Riggle's sons, Phillip and Keith, his daughter, Veronica, and his grandson, Luis Figueroa. On March 5, 2012, Valerie circulated a memorandum to Seaboard's employees stating that Riggle had retired and that Phillip Riggle, Keith Riggle, Veronica Riggle, and Luis Figueroa had resigned, even though she knew that those statements were untrue.

Riggle attended a Seaboard board of directors meeting on October 5, 2012. At that meeting, Valerie and Verma passed a resolution amending Seaboard's bylaws to allow the same person to hold the offices of president and secretary. They then reelected Valerie as Seaboard's secretary. Riggle voted against both resolutions.

On March 13, 2013, Riggle attended Seaboard's annual shareholders and directors meetings. Valerie, Verma, and Riggle were reelected as directors although Riggle did not vote for either Verma or Valerie. At the directors meeting, Riggle urged that a resolution be passed to dissolve Seaboard and to distribute the net proceeds from the dissolution to

Seaboard's shareholders in accordance with their ownership interests. Valerie and Verma would not second Riggle's motion for such a resolution.

At the March 13, 2013 shareholder meeting, Valerie gave Riggle a 2012 S Corporation Schedule and a California Schedule K-1 indicating that in 2012 Seaboard had ordinary business income of $79,248 and net rental income of $104,026. Although Riggle received no profit distributions from Seaboard in 2012, or at any other time, the 2012 federal and California tax forms indicate that Riggle faces significant tax liability from Seaboard's operations.

Neither Riggle nor any other Seaboard shareholder has ever received a dividend payment. Riggle's salary has been his sole remuneration from his investment in the company. Since the March 2, 2012 termination of his employment, Riggle has not received any salary, dividends, or other revenue from his ownership interest in Seaboard. Ronald, on the other hand, continued to receive from Seaboard an annual salary of $100,000 through October 2012, notwithstanding his physical, mental, and cognitive impairment.

**Procedural background**

Riggle commenced the instant action on May 18, 2012. In response to a demurrer by Seaboard, Riggle filed a first amended complaint in which he asserted causes of action for involuntary dissolution of Seaboard under section 1800, age discrimination, and wrongful termination in violation of public policy. He later voluntarily dismissed the claims for age discrimination and wrongful termination.

Riggle filed a motion for summary adjudication of his sole remaining claim for involuntary dissolution of Seaboard. In support of the motion, Riggle submitted a separate statement of undisputed facts, supported by his own declaration, deposition testimony of Valerie and Verma, and other documentary evidence. Seaboard opposed the motion. In support of its opposition, Seaboard submitted its own separate statement, supported in turn by Valerie's declaration, the declaration of an accounting expert, Riggle's deposition testimony, and other documentary evidence.

4

After hearing argument from the parties, the trial court granted the motion for summary adjudication based on numerous undisputed material facts. An order granting the motion for summary adjudication was entered on October 22, 2013, and an order for dissolution of Seaboard was entered on December 6, 2013. This appeal followed.

## DISCUSSION

### I. Standard of review

A motion for summary judgment or summary adjudication is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) When reviewing the grant of a motion for summary judgment or summary adjudication, we independently consider whether a triable issue of material fact exists and whether the moving party is entitled to summary judgment or adjudication as a matter of law. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631.) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. Initially, the moving party bears a burden of production to make a prima facie showing of the nonexistence of any genuine issue of material fact. If he carries his burden of production, he causes a shift: the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845 (*Aguilar*).)

### II. Involuntary dissolution

#### A. *Corporations Code section 1800*

Any shareholder of a small, closely held corporation may petition for its involuntary dissolution under section 1800. (§ 1800, subd. (a)(2); *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1112 (*Bauer*).) That statute enumerates several grounds for involuntary dissolution. As relevant here, subdivision (b)(5) of section 1800 provides for involuntary dissolution "[i]n the case of any corporation with 35 or fewer shareholders"

5

when "liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder or shareholders." (§ 1800, subd. (b)(5).)[4]

When faced with an action for involuntary dissolution under section 1800, a corporation has a statutory right to avoid dissolution by purchasing for cash and at "fair value" the shares held by any shareholder who has sued to dissolve the corporation. (§ 2000, subd. (a).) If the corporation declines to exercise this right, the holders of 50 percent or more of the voting shares may do so. (*Ibid.*)

### B. Case law

There are three cases which address the right of minority shareholders to force dissolution of a closely held corporation because their interests and rights cannot be protected. The first, *Stumpf v. C. E. Stumpf & Sons, Inc.* (1975) 47 Cal.App.3d 230 (*Stumpf*), was decided under former section 4651, the predecessor statute to section 1800. Former section 4651, subdivision (f) allowed involuntary dissolution when "[t]he liquidation is reasonably necessary for the protection of the rights or interests of any substantial number of the shareholders, or of the complaining shareholders." (*Id.* at p. 233, fn. 2.) The corporation in *Stumpf* was owned in equal shares by C. G. Stumpf, Sr., and his two sons. One of the sons, Donald, left the company after a managerial dispute. He was later removed as an officer and he did not seek thereafter to participate in the

---

[4] The other grounds for involuntary dissolution under section 1800 are: under subdivision (b)(1), the corporation has abandoned its business for more than one year; (b)(2) the corporation has an even number of directors who are equally divided and cannot agree as to the management of its affairs so that its business can no longer be conducted or there is danger that its property and business will be impaired or lost, and the voting shareholders are so divided into factions that they cannot elect a board consisting of an uneven number; (b)(3) there is internal dissension, and shareholder factions are deadlocked so that corporate business can no longer be conducted, or the shareholders have failed at two consecutive annual meetings, at which all voting power was exercised, to elect successors to directors with expired terms; (b)(4) those in control of the corporation have been guilty of or have knowingly allowed persistent and pervasive fraud, mismanagement, abuse of authority, or persistent unfairness toward any shareholders, or the corporation's property is being misapplied or wasted by the directors or officers; and (b)(6) the period for which the corporation was formed has terminated without extension.

corporation's business.  Donald sought involuntary dissolution of the company, and the trial court granted Donald's request.

On appeal, the corporation argued that dissolution was improper absent a finding of deadlock, mismanagement, or unfairness toward Donald.  The trial court had found no mismanagement or unfairness, which were other grounds for dissolution under former section 4651, and there was no evidence of a corporate deadlock.  The appellate court in *Stumpf* affirmed the order of dissolution, concluding that subdivision (f) of former section 4651 "empower[ed] the courts to order dissolution when required to assure fairness to minority shareholders . . . ."  (*Stumpf, supra*, 47 Cal.App.3d at p. 234.)  The court recognized, however, that minority shareholders do not wield unlimited power to force an involuntary dissolution:  "The procedure created by the statute does not authorize dissolution at will.  The minority must persuade the court that fairness requires drastic relief under [former] section 4651, subdivision (f); involuntary dissolution is not an automatic remedy but, rather, a matter for the court's discretion."  (*Id*. at p. 235.)

The court in *Stumpf* concluded that involuntary dissolution was warranted in light of substantial evidence that extreme hostility between Donald and his brother had forced Donald to withdraw from the business, that Donald had no say in the operation of the company, and that he received no salary, dividends, or other revenue from his investment in the corporation after he withdrew from the business.  The *Stumpf* court further concluded that a trial court is to exercise its discretion in ruling on an action for involuntary dissolution of a corporation and found no abuse of discretion under the circumstances presented.  (*Stumpf, supra*, 47 Cal.App.3d at p. 235.)

The second case addressing involuntary dissolution is *Bauer*.  The minority shareholders seeking involuntary dissolution in *Bauer* went into business in direct competition with the corporation and were subsequently fired on the grounds that they had disrupted the corporation's business, solicited its customers, and used proprietary information for the purpose of competing with the corporation.  (*Bauer, supra*, 46 Cal.App.4th at pp. 1110-1111.)  Following a trial, the court refused to grant involuntary dissolution.  On appeal, the minority shareholders claimed they were entitled to

7

involuntary dissolution under section 1800, subdivision (b)(4) as the result of persistent fraud, mismanagement, abuse of authority, or persistent unfairness toward them as minority shareholders and under subdivision (b)(5) to protect their rights and interests. With regard to the subdivision (b)(5) claim, the minority shareholders argued that dissolution was reasonably necessary to protect their interests because they had received no dividends or other remuneration from the corporation since termination of their employment. (*Id*. at p. 1116.)

In affirming the trial court's denial of relief under section 1800, the appellate court in *Bauer* held that "[i]n enacting the two separate provisions of subdivision (b)(4) and (b)(5) [of section 1800], the Legislature clearly distinguished between a cause of action for involuntary dissolution based on the controlling shareholders' misconduct, and one based specifically on protection of the rights, interests and expectations of complaining minority shareholders." (*Bauer, supra*, 46 Cal.App.4th at pp. 1113-1114.) The court concluded that the grounds for dissolution under subdivision (b)(5) of section 1800 are considerably broader than those in subdivision (b)(4), but that minority shareholders must still persuade the court that dissolution is necessary to ensure fairness. (*Bauer*, at p. 1116.) The court in *Bauer* held that in light of the minority shareholders' bad faith conduct in establishing a competing business and soliciting the corporation's clients, the trial court did not abuse its discretion by denying them relief. (*Id*. at p. 1117.) The court found that nonpayment of corporate dividends was not a basis for involuntary dissolution because the minority shareholders had never been paid any dividends and because there was evidence that there were no profits from which dividends could be paid during the period at issue. (*Ibid*.)

The third involuntary dissolution case, *Stuparich v. Harbor Furniture Manufacturing, Inc.* (2000) 83 Cal.App.4th 1268 (*Stuparich*), involved an action under section 1800, subdivision (b)(5) by two sisters who were the minority shareholders of a family owned corporation run by their brother Malcolm as chief executive officer. The sisters each held approximately 19 percent of the voting shares, and Malcolm held approximately 51 percent.

The corporation operated both a furniture manufacturing business and a mobilehome park. Malcolm, his wife, and his son were all employed by the furniture manufacturing entity and were paid annual salaries. Malcolm's sisters had never been involved in the operation of the corporation's businesses, other than by attendance at board meetings.

A dispute arose between the siblings when the sisters proposed a corporate reorganization that would separate the mobilehome park operation from the furniture manufacturing operation because the furniture business was incurring financial losses each year while the mobilehome park was very profitable. The proposed reorganization would insulate the profits of the mobilehome park from the furniture losses. (*Stuparich, supra*, 83 Cal.App.th at p. 1271.) Malcolm notified his sisters that their shareholder meeting notice was defective and that no meeting would be held to discuss the proposed reorganization. The sisters then filed an action for involuntary dissolution of the company.

The corporation moved for summary judgment, arguing that dissolution was a drastic and inappropriate remedy because the only factual basis for the action was the minority shareholders' desire to no longer be involved with the business. The sisters opposed the motion, arguing that dissolution was necessary because their relationship with Malcolm had deteriorated to the point of violence, making it impossible for them to work together either as a family or as a corporate entity. The sisters further argued that their interests and their brother's were diametrically opposed because Malcolm and his wife received salaries and other compensation exceeding $200,000 per year from the unprofitable furniture business, and he therefore had a vested interest in continuing its operation. The sisters argued that they drew no salary from the furniture business and obtained no benefit from that enterprise. They had asked to be bought out, but Malcolm had refused. (*Stuparich, supra*, 83 Cal.App.4th at pp. 1272-1273.)

In affirming the summary judgment entered in favor of the corporation, the court in *Stuparich* found that the minority shareholders raised no triable issue of material fact as to whether dissolution was reasonably necessary to protect their rights or interests,

9

given the following undisputed facts: Malcolm had been instrumental in the operation of the company and his sisters had no role in day-to-day operations. Although a recent furniture business slump had reduced the furniture manufacturing sector's success, that downward trend had ceased and the corporation's furniture business was becoming more successful. Although a dispute arose between the shareholders as to the viability of the furniture business, the mobilehome park generated significant profits which were paid out to the minority shareholders as dividends. The court in *Stuparich* concluded that the minority shareholders were not entitled to substitute their business judgment for that of their brother's with respect to the viability of the furniture operations. The court distinguished *Stumpf* by noting that unlike the plaintiffs in that case, the minority shareholders in *Stuparich* continued to receive dividends up until they instituted their lawsuit. (*Stuparich, supra*, 83 Cal.App.4th at p. 1279.)

With the foregoing cases in mind, we turn to Seaboard's arguments on appeal.

## III. Summary adjudication was properly granted

In moving for summary adjudication of his claim for involuntary corporate dissolution, Riggle met his initial burden of producing evidence establishing the following undisputed facts: Riggle and his half-brother Ronald are Seaboard's sole shareholders. Riggle owns 41.65 percent of Seaboard's shares, and Ronald owns the remaining 58.35 percent. Seaboard never paid Ronald or Riggle any dividends but paid each of them a salary and provided them with health insurance. Riggle has worked at Seaboard since 1964, when he was 24 years old. He was fired at age 73 after Ronald's daughter Valerie took control of the company pursuant to an irrevocable proxy to vote Ronald's Seaboard shares. Seaboard stopped paying Riggle's salary and benefits after terminating his employment but continued to pay Ronald a $100,000 annual consulting fee, notwithstanding Ronald's disability and cognitive impairment.

In addition to firing Riggle, Valerie also banned him from Seaboard's premises unless he first obtained her permission to enter the premises and was at all times accompanied by her. Valerie also fired Riggle's children and grandson, all of whom had

10

been employed by Seaboard. She falsely reported to Seaboard's employees that Riggle had retired and that his children and grandson had resigned.

After Valerie obtained voting control of Ronald's Seaboard's shares, she and her longtime boyfriend, Verma, joined Seaboard's board of directors. She also became Seaboard's president and chief executive officer, chief financial officer, and secretary. Although Riggle is also a Seaboard director and attends director and shareholder meetings, he has no effective input into Seaboard's management. As a shareholder, he is always outvoted by Valerie, and as a director he is outvoted by Valerie and Verma, whose vote is always aligned with Valerie's. Riggle faces significant tax liability as the result of income attributable to him in 2012 as a Seaboard shareholder, despite the fact that he has received no dividends, salary, or other remuneration from Seaboard since his employment was terminated.

Because Riggle met his initial burden of production, the burden shifted to Seaboard to make a prima facie showing that a triable issue of material fact exists. (*Aguilar, supra*, 25 Cal.4th at p. 845.) It failed to do so. Seaboard claims to have disputed many of facts established by Riggle; however, a review of Seaboard's responsive separate statement and supporting evidence shows that the material facts are undisputed. For the most part, Seaboard presents arguments instead of contrary facts and evidence. For example, Seaboard in its responsive separate statement does not dispute that Riggle has been barred from entering its premises without express permission and and an escort, or that Riggle's vote as a director is meaningless because Valerie and her boyfriend Verma always vote together and against him, but simply argues that this situation does not hinder Riggle's ability to participate in decisions affecting Seaboard's management. Seaboard similarly claims to have disputed the fact that Riggle faces significant tax liability as the result of Seaboard profits attributed to him in 2012, even though he received no profit distributions for 2012 or for any other year. Seaboard failed, however, to produce any evidence to dispute that fact. The only evidence produced was a declaration by Seaboard's accounting expert stating that because he lacked sufficient information about Riggle's finances, "it cannot be determined . . . whether or not Mr.

11

Riggle will in fact have to pay tax on the income reported to him . . . ."  Seaboard does not dispute that Riggle has never received a dividend, and that his sole remuneration from the company has been his salary.  Seaboard also does not dispute that Riggle has received no salary, dividends, or other remuneration from the company since it terminated his employment.  It simply argues that that payment of dividends is not legally required.  Seaboard does not dispute that Ronald continued to receive an annual salary of $100,000, notwithstanding his physical, mental, and cognitive impairment.  Rather, Seaboard's own evidence shows that it continued to pay Ronald's salary through October 2012, months after it terminated Riggle's employment.

Seaboard contends it presented in its responsive separate statement several additional disputed material facts, including that Riggle's former title as chief financial officer was largely ceremonial, that Valerie had "cause" to terminate Riggle and his family members, that Seaboard's accounting expert believed Valerie and Verma were qualified to act as corporate directors, that Riggle has not been denied access to Seaboard's records, and that Riggle does not claim "mismanagement" of Seaboard.  None of these facts are material to the question of whether Riggle is entitled to relief under section 1800, subdivision (b)(5).

Seaboard next argues that Riggle failed to meet his burden of proof in moving for summary adjudication because he failed to establish facts negating defenses and facts Seaboard raised in its responsive separate statement.  Riggle's initial burden of proof in moving for summary adjudication did not include disproving defenses and facts asserted by Seaboard.  (*Aguilar, supra*, 25 Cal.4th at p. 845.)  Under Code of Civil Procedure section 437c, a plaintiff meets its burden by proving each element of the cause of action.  Once the plaintiff has met that burden, the burden then shifts to the defendant "'to show that a triable issue of one or more material facts exists as to that cause of action *or a defense thereto*.'  [Citations.]"  (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 564.)  Riggle met his initial burden in moving for summary adjudication against Seaboard by producing evidence establishing grounds for

12

relief under section 1800, subdivision (b)(5). The burden then shifted to Seaboard to show that a triable issue of material fact exists. Seaboard failed to do so.

The circumstances of this case are similar to those in *Stumpf*, in which the court found involuntary corporate dissolution reasonably necessary in order to protect the interests of a minority shareholder. Like Seaboard, the corporation in *Stumpf* had never paid dividends; instead, profits were reinvested in the business. The plaintiff in *Stumpf*, like Riggle, was a longtime employee and shareholder in a family owned business who was fired as a result of a managerial dispute and thereafter was allowed no say in the operation of the business. Like Riggle, the plaintiff in *Stumpf* received no salary, dividends, or other revenue from his investment in the corporation following his ouster.

Seaboard attempts to distinguish *Stumpf* by arguing that the ousted plaintiff in that case was an original "founder" of the company, whereas Riggle is not. The distinction is not relevant. Riggle's 48-year history with Seaboard, and his status a director, shareholder, and longtime former employee are more than sufficient to establish a significant stake in the company. Seaboard argues that Riggle's continued participation as a Seaboard director is another basis for distinguishing *Stumpf*, in which the plaintiff left the company altogether after he was fired. That distinction is also immaterial, in light of the undisputed evidence that Riggle's continued involvement as a Seaboard director is ineffectual, given Valerie's control of the board since Verma's addition as a director.

Seaboard cites *Bauer* and *Stuparich* in support of its position; however, both of those cases are distinguishable. The minority shareholders in *Bauer* were denied relief because of their bad faith conduct in setting up a competing company and soliciting the corporation's customers and business for themselves. (*Bauer, supra*, 46 Cal.App.4th at p. 1117.) The *Bauer* court concluded that "[i]t would be tantamount to sanctioning abuse to permit minority shareholders acting in bad faith to use [section 1800,] subdivision (b)(5) as a coercive tool to force an involuntary dissolution. [Citations.]" (*Ibid*.) The court in *Bauer* further concluded that the complaining shareholders had no reasonable expectation of receiving a salary or dividends from the company because, as a result of their own previous mismanagement of the business, there were no profits to distribute. (*Ibid*.) The

record here shows no bad faith conduct by Riggle.  It shows that in 2012 Seaboard had substantial undistributed profits.  *Bauer* is thus distinguishable.

*Stuparich* is also distinguishable.  The minority shareholders in that case had no active role in the daily operations of the corporation.  Although they served as directors for six years, they resigned those positions before filing their action for involuntary dissolution.  Riggle, by contrast, had been employed by Seaboard for nearly 50 years and sought to continue to participate as a director of the company following termination of his employment and stacking of the board against him.  The minority shareholders in *Stuparich* received monthly dividends totaling $1.6 million at the time they filed their lawsuit.  (*Stuparich, supra*, 83 Cal.App.4th at p. 1272.)  Riggle has never received any dividends, despite evidence that Seaboard is a profitable business.

The undisputed facts in this case support Riggle's claim for relief under section 1800, subdivision (b)(5).  Given the undisputed record, we cannot say that the trial court erred in finding, as a matter of law, that liquidation of Seaboard was reasonably necessary for the protection of Riggle's rights and interests as a shareholder.  (§ 1800, subd. (b)(5).)

## DISPOSITION

The order granting summary adjudication is affirmed, as is the order for dissolution of Seaboard.  Riggle is awarded his costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

14